[Cite as *State ex rel. Pruce v. Ohio Pub. Emp. Retirement Sys. Bd.*, 2018-Ohio-713.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Deborah Pruce, | : | |
| Relator, | : | |
| v. | : | No. 16AP-782 |
| Ohio Public Employees Retirement System Board | : | (REGULAR CALENDAR) |
| and | : | |
| Geauga County Department of Job and Family Services, | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on February 27, 2018

*James M. Gillette,* for relator.

*Michael DeWine*, Attorney General, *John J. Danish* and *Mary Therese J. Bridge,* for respondent Ohio Public Employees Retirement System Board.

*James R. Flaiz,* Geauga County Prosecuting Attorney, and *Susan T. Wieland,* for respondent Geauga County Department of Job and Family Services.

IN MANDAMUS

TYACK, J.

{¶ 1} Deborah Pruce filed this action in mandamus seeking a writ to compel the Ohio Public Employees Retirement System ("OPERS") to consider her to be a public employee from April 15, 2002 through January 31, 2009.

{¶ 2} In accord with Loc.R. 13(M) of the Tenth District Court of Appeals, the case was referred to a magistrate to conduct appropriate proceedings. The parties provided

the pertinent evidence to the magistrate and filed briefs. The magistrate then issued a magistrate's decision, appended hereto, which contains detailed findings of fact and conclusions of law. The magistrate's decision includes a recommendation that we deny the request for a writ.

**{¶ 3}** No party has filed objections to the magistrate's decision.

**{¶ 4}** Since no party has filed objections, we are to first analyze whether the magistrate's decision displays an error of law or fact on the face of the decision.

**{¶ 5}** The magistrate's decision runs some 26 pages. It carefully analyzes the distinction in the Ohio Administrative Code between a public employee and an independent contractor. The magistrate correctly determined that OPERS did not abuse its discretion when it found that Deborah Pruce was an independent contractor during the pertinent time.

**{¶ 6}** No error of law or fact is present on the face of the magistrate's decision. We, therefore, adopt the findings of fact and conclusions of law in the magistrate's decision and deny the request for a writ of mandamus.

*Writ of mandamus denied.*

KLATT and SADLER, JJ., concur.

———————

# A P P E N D I X

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Deborah Pruce, | : | |
| Relator, | : | |
| v. | : | No. 16AP-782 |
| Ohio Public Employees Retirement System Board | : | (REGULAR CALENDAR) |
| and | : | |
| Geauga County Department of Job and Family Services, | : | |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on October 25, 2017

*James M. Gillette,* for relator.

*Michael DeWine*, Attorney General, *John J. Danish,* and *Mary Therese J. Bridge,* for respondent Ohio Public Employees Retirement System Board.

*James R. Flaiz,* Geauga County Prosecuting Attorney, and *Susan T. Wieland,* for respondent Geauga County Department of Job and Family Services.

IN MANDAMUS

{¶ 7} In this original action, relator, Deborah Pruce, requests a writ of mandamus ordering respondent, Ohio Public Employees Retirement System Board ("OPERS" or "board"), to vacate its December 16, 2015 decision that adopted the March 31, 2015 report of its hearing examiner that determined that relator was not a public employee of the

Geauga County Department of Job and Family Services ("JFS") from April 15, 2002 through January 31, 2009 and, thus, she is not entitled to OPERS membership during that period. The hearing examiner determined that relator was an "independent contractor" as defined by former Ohio Adm.Code 145-5-15(A)(2) and currently by Ohio Adm.Code 145-1-42(A)(2). As an "independent contractor" relator is excluded from OPERS membership for that time period.

Findings of Fact:

{¶ 8}   1. On April 8, 2013, relator completed an OPERS form captioned "**NOTICE OF RIGHT AND REQUEST FOR:** DETERMINATION FOR OPERS MEMBERSHIP." The form is designated by OPERS as form "PEDREQ." The purpose of the form is explained at the top of the first page:

> You have been identified as an individual who provided personal services to a public employer prior to Jan. 7, 2013. You were classified as an independent contractor or another classification, other than a public employee, and no contributions were made to OPERS on your behalf for these services. Ohio law requires that the public employer provide you with this notice of your right to a request a determination as to whether you should have been classified as a public employee for these services.
>
> In order to request that OPERS determine whether you should have been classified as a public employee, please complete the information below and return this form to OPERS at * * *. Ohio law provides that a request for determination must be made within one year from Jan. 7, 2013. **No requests for determinations for personal services provided prior to Jan. 7, 2013 will be accepted after Jan. 7, 2014, unless you are able to demonstrate through medical records to the Board's satisfaction that you were physically or mentally unable to do so at the time the one-year period ended.**

(Emphasis sic.)

{¶ 9}   On the second page, the form states: "I am requesting that OPERS issue a determination as to my eligibility for OPERS membership for services I provided to the following public employer."

{¶ 10} In the space provided, relator named "Geauga County Job & Family Services" as her public employer. She further indicated that her job title with JFS was "Service Coordinator for Help Me Grow Program."

{¶ 11} 2. By letter dated May 1, 2013, OPERS informed relator:

> We have recently received Notice of Right and Request for Determination for OPERS Membership, Form PEDREQ, requesting a review of membership determination for service as an independent contractor with the Geauga County Job and Family Services as Service Coordinator for Help Me Grow for the period 2/22/2002 to 1/30/2009. Before we can determine whether you are eligible for OPERS service for this employment we must have additional information from you and the employer.
>
> Please complete the enclosed *Independent Contractor/Employee Determination for Worker,* form PED-1EE relative to this service. * * * We have requested that the employer complete a <u>separate</u> form.

(Emphasis sic.)

{¶ 12} 3. On November 25, 2013, relator signed an OPERS form captioned "Independent Contractor/Employee Determination for Worker." At the top of the first page of this four-page form, the form explains:

> This form is used by OPERS to obtain information to determine whether a worker is a public employee for purposes of state retirement * * *.
>
> * * *
>
> Complete this form in its entirety, sign and date it, and submit it directly to OPERS at the above address. Any supporting documentation should accompany this form. The employer will complete and submit an Independent Contractor/Employee Determination for Employer (PED-1ER) that asks for similar information.

{¶ 13} 4. By letter dated February 6, 2014 from "Employer Compliance Specialist" Rosetta M. Freeman, OPERS issued its staff determination pursuant to Ohio Adm.Code 145-1-10. The one-page letter explains the determination that relator was not a public employee for the period at issue:

I am writing in response to your request for a determination on whether you were a public employee for your service as Help Me Grow Service Coordinator for the period of 4/15/2002-2/1/2009.

Based upon my review of the information submitted by both parties, I find that you are not a public employee for the services provided during the time period stated above.

Please be advised Ohio Admin.Code 145-5-15 and 145-1-42(A)(2) defines an independent contractor as an individual who is party to a bilateral agreement which may be a written document, ordinance, or resolution that defines the compensation, rights, obligations, benefits and responsibilities of both parties; is paid a fee, retainer or other payment by contractual arrangement for particular services; is not eligible for Workers' Compensation, is not eligible for unemployment compensation; may not be eligible for employee fringe benefits such as vacation or sick leave; does not appear on a public payroll; is required to provide his own supplies and equipment, and provide and pay his assistants or replacements if necessary; is not controlled or supervised by personnel of the public employer as to the manner of work; and should receive an Internal Revenue Service Form 1099 for income tax reporting purposes.

According to the information submitted, your position was established with an annual contract by which both parties were in agreement. You were paid a fee per hour with a limit set not to exceed. You submitted invoices for compensation and received a 1099 for income tax purposes. You were allowed to subcontract your work after getting approval from the employer. Additionally, you did not receive fringe benefits such as sick, vacation or insurance, nor were you covered by the employer's Workers' Compensation or Unemployment Compensation, all which were addressed in your contract.

Based on this information and the above definition we have determined the working relationship to be not that of a public employee and; therefore, is excluded from contributing Ohio PERS membership per Section 145.012 of the Ohio Revised Code.

Any party may appeal this staff determination within thirty (30) days from the date of this letter. A written request for

appeal, accompanied by additional information supporting the appeal, must be submitted to Julie Emch Becker, OPERS General Counsel.

{¶ 14} 5. By letter dated March 1, 2014, relator administratively appealed the February 6, 2014 staff determination pursuant to Ohio Adm.Code 145-1-10.

{¶ 15} 6. By letter dated April 30, 2014, OPERS, through its General Counsel, Julie Emch Becker, issued its senior staff determination pursuant to Ohio Adm.Code 145-1-10(C). General Counsel's three-page letter explains:

> This letter is in response to your March 1, 2014 appeal of the staff determination issued on February 6, 2014 finding that you were not an employee of the Geauga County Department of Job and Family Services ("JFS") as a Help Me Grow Service Coordinator from April 15, 2002 through January 31, 2009.
>
> Based upon my review of this matter, I find that you were providing services as an independent contractor pursuant to a personal service contract and, therefore, you are not eligible for OPERS membership for this service.
>
> **Background**
> You first began providing services in April 2002. During the period in question, both parties acknowledge that you provided services pursuant to annual written contracts and that no OPERS contributions were remitted to OPERS. On February 2, 2009, you were hired by the Geauga County Board of Mental Retardation and Developmental Disabilities as a public employee.
>
> **Law and Analysis**
> Ohio Administrative Code 145-5-15(A)(2),[1] the relevant law in place during the period in question, defines an independent contractor as an individual who:
>
> a) Is party to a bilateral agreement which may be a written document, ordinance, or resolution that defines the compensation, rights, obligations, benefits and responsibilities of both parties;

---

[1] In 2003, this section of Administrative Code was renumbered as 145-1-42. However, the definition of independent contractor remained the same for the entire period of your service.

b) Is paid a fee, retainer or other payment by contractual agreement for particular services;

c) Is not eligible for workers' compensation or unemployment compensation;

d) May not be eligible for employee fringe benefits such as vacation or sick leave;

e) Does not appear on a public payroll;

f) Is required to provide his own supplies and equipment, and provide and pay his assistants or replacements if necessary;

g) Is not controlled or supervised by personnel of the public employer as to the manner of work;

h) Should receive an Internal Revenue Service Form 1099 for income tax reporting purposes.

The information provided by you and Geauga County Auditor Frank Ghila demonstrates that you provided services as an independent contractor pursuant to annual written contracts, in which you are explicitly referred to as a "contractor." The Plan of Operation for each contract specifically outlined the duties performed and rate of compensation. Further, this document specifically states that you were not an employee of Geauga County and that you were not eligible for insurance, workers' compensation, sick or vacation leave or any other benefits offered to JFS employees. The contracts also support the fact that you did not appear on JFS payroll. Instead, you were required to submit billings for work performed at designated intervals and to maintain financial records to support the billings. Lastly, you received an IRS Form 1099 for income tax reporting purposes. After becoming an OPERS contributing member on February 2, 2009, you began receiving an IRS Form W-2.

The contracts also indicate that, unlike a public employee, you were responsible for researching and acquiring Professional Liability Insurance. If you chose not to carry Professional Liability Insurance, you would maintain sole responsibility for any claim or suit brought against JFS.

> The hiring or paying of assistants was not an element related to your service. However, the contact [sic] did permit you to subcontract, with the prior written approval of JFS. Additionally, either party could terminate the contact [sic] with 30 days written notice to the other. JFS exercised this right of termination in the December 30, 2008 letter from Tim Taylor to you. While JFS provided (shared) office space, equipment and supplies, these factors alone are not determinative as the remaining requirements of Administrative Code 145-5-15 have been met. Further, JFS' supervision over your service seemed appropriate, given the nature of the services performed. JFS' supervision did not appear to be * * * excessive or unreasonable.

> **Conclusion**
> The record clearly establishes that you provided services to JFS as an independent contractor under a personal service contract during the relevant time period. As a result, you were not a public employee eligible for OPERS membership or service credit for this service.

{¶ 16} 7. By letter dated June 25, 2014, relator, through counsel, administratively appealed the April 30, 2014 senior staff determination, pursuant to Ohio Adm.Code 145-1-11, to the OPERS board.

{¶ 17} 8. With the appeal, counsel submitted as exhibits three written contracts captioned "Help Me Grow Home Visitor CONTRACT."  (Emphasis sic.)

{¶ 18} The first contract, exhibit 1, was executed by relator and a representative of JFS in April 2002.  The contract covers the period April 15 through December 30, 2002. The four-page contract provides in part:

> The scope and coverage of services to be provided by the **CONTRACTOR**, the program description and budget for those services, as well as other necessary components are described in the attached Plan of Operation, which is incorporated into this contract in its entirety by specific reference. The Plan of Operation will be maintained on file with **JFS** as a part of this contract.

(Emphasis sic.)

{¶ 19} Appended to the contract is a two-page document captioned "Help Me Grow Home Visitor[,] PLAN OF OPERATION." The Plan of Operation was executed by relator and a representative of JFS in April 2002. The Plan of Operation states in its entirety:

### I. Compensation

For time spent in direct client contact (including travel time), preparation for direct client contact, follow-up to direct client contact, data entry or required reporting or training, **CONTRACTOR** will be compensated at a rate of **$25.00 per hour.**

### II. Expenses

Mileage for necessary travel specifically related to services performed under this contract will be submitted on the existing JFS Expense Form. Mileage will be reimbursed at the rate determined by the Geauga Board of County Commissioners for county employees.

Other direct expenses specifically related to services performed under this contract, such as purchasing books, toys or other incentives, will be submitted to JFS prior to purchase on a JFS Encumbrance Request form. Subsequent to the purchase, the original receipt and description of the expense will be submitted on a JFS Expense Form for reimbursement. **CONTRACTOR** will use a JFS tax exempt form for purchases, as sales tax **will not** be reimbursed.

### III. Space/Supplies

**JFS** shall furnish all supplies and equipment necessary for the **CONTRACTOR** to perform its duties hereunder. This includes, but is not limited to, paper, pens, phone access, copy machine access, computer access. **JFS** will also furnish office space in its building or other building, if appropriate. All materials, tools and supplies must remain on **JFS** premises unless otherwise agreed by **JFS**.

### IV. Supervision

Clinical supervision of **CONTRACTOR** will be provided by **JFS**, either directly or through contract with another entity.

**JFS** will be responsible for administrative supervision of all **CONTRACTORS**, either directly or through contract with another entity.

### V. Training

**CONTRACTOR** agrees to attend any training required by the ODJFS or the ODH, as related to the provision of services under this contract. Other relevant trainings may be attended, with prior approval of the **JFS**. Reimbursement for travel, lodging or meals related to Training, must have prior approval on a JFS Request for Outside Training. Expenses will be submitted on a JFS Expense Form, with original receipts, for reimbursement.

**VI. Reporting and Data Entry**
**CONTRACTOR** agrees to comply with all reporting requirements of JFS, ODHS, ODH or Family First Council. **CONTRACTOR** also agrees to enter data into the Early Track system, as required by the program, or to submit data for entry into the Early Track system, if appropriate.

**VII. Independent Contractor**
**CONTRACTOR** is employed as an independent contractor, not as an employee of the Geauga County Job and Family Services. Accordingly, the **CONTRACTOR** hereby acknowledges that **JFS** will not provide insurance, worker's compensation, medical benefits, vacation and sick leave, or any other perquisites and benefits which are received by employees of **JFS**.

**VIII. Insurance**
**CONTRACTOR** is responsible for researching and acquiring Professional Liability Insurance. If the **CONTRACTOR** chooses to not carry Professional Liability Insurance, the **CONTRACTOR** will maintain sole responsibility for any claim, suit or proceeding brought against them, or against the **JFS** directly related to services provided by the **CONTRACTOR**, on the issue of malpractice, or wrongdoing of any kind and agrees to hold **JFS** harmless in any such claim, suit or proceeding.

(Emphasis sic.)

{¶ 20} The second contract, exhibit 2, submitted by relator with her appeal was executed by relator and a representative of JFS in July 2003. The contract covers the period July 1 through December 31, 2003.

{¶ 21} Appended to the second contract is, again, a two-page document captioned "Help Me Grow Home Visitor[,] PLAN OF OPERATION." (Emphasis sic.) The Plan of

Operation, was executed by relator and a JFS representative in July 2003. The Plan of Operation executed July 2003 differs somewhat from the Plan of Operation executed in April 2002. The July 2003 Plan of Operation states in its entirety:

> I. Compensation
> For time spent in direct client contact, preparation for direct client contact, follow-up to direct client contact, data entry or required reporting or training, CONTRACTOR will be compensated at a rate of $25.00 per hour. Hours of service provided and charged by the CONTRACTOR under the terms of this shall not exceed one thousand and forty (1040) hours during the term of this contract.
>
> As provided for in Section V. of this Plan of Operation, CONTRACTOR will be compensated at the rate of $25.00 per hour for a maximum of ten (10) hours per calendar year for time spent in mandated training.
>
> For time spent in training beyond the ten hours of mandated training referred to in this section, CONTRACTOR will be compensated $25.00 for every two hours of training up to a maximum of eight hours of training per day. Reimbursement for training under this provision will not exceed twelve hours of reimbursement (twenty-four hours of training) during the contract year.
>
> II. Expenses
> Mileage for necessary travel specifically related to services performed under this contract will be submitted on the existing JFS Expense Form. Mileage will be reimbursed at the rate determined by the Geauga Board of County Commissioners for county employees.
>
> Other direct expenses specifically related to services performed under this contract, such as purchasing books, toys or other incentives, will be submitted to JFS prior to purchase on a JFS Encumbrance Request form. Subsequent to the purchase, the original receipt and description of the expense will be submitted on a JFS Expense Form for reimbursement. CONTRACTOR will use a JFS tax exempt form for purchases, as sales tax will not be reimbursed.
>
> III. Space/Supplies
> JFS shall furnish all supplies and equipment necessary for the CONTRACTOR to perform its duties hereunder. This

includes, but is not limited to, paper, pens, phone access, copy machine access, computer access. JFS will also furnish office space in its building or other building, if appropriate. All materials, tools and supplies must remain on JFS premises unless otherwise agreed by JFS.

IV. Supervision
The CONTRACTOR will receive a minimum of eight hours of Clinical Supervision on a monthly basis from a Clinical Supervisor designated by JFS. Clinical Supervision will occur through case reviews and by individual consultation. The CONTRACTOR agrees to follow the recommendations and guidance of the Clinical Supervisor.

The CONTRACTOR will receive program and administrative supervision from a Supervisor designated by JFS. The Supervisor will oversee the provisions of the Contract, the Plan of Operation, policies and procedures and administrative tasks such as time sheets, mileage, travel requests, travel reimbursements and encumbrance requests. A performance evaluation assessing clinical, programmatic and contractual performance will be conducted at least once per calendar year.

V. Training
CONTRACTOR agrees to attend any training required by JFS or the ODJFS, as related to the provision of services under this contract. Other relevant trainings may be attended, with prior approval of the JFS. Reimbursement for travel, lodging or meals related to Training, must have prior approval on a JFS Request for Outside Training. Expenses will be submitted on a JFS Expense Form, with original receipts, for reimbursement. Reimbursement for expenses for training submitted under this section will be limited to $400.00 for the term of this contract.

VI. Reporting and Data Entry
CONTRACTOR agrees to comply with all reporting requirements of JFS, ODHS, ODH or Family First Council. CONTRACTOR also agrees to enter data into the Early Track system, as required by the program, or to submit data for entry into the Early Track system, if appropriate.

VII. Independent Contractor
CONTRACTOR is employed as an independent contractor, not as an employee of the Geauga County Job and Family

Services. Accordingly, the CONTRACTOR hereby acknowledges that JFS will not provide insurance, worker's compensation, medical benefits, vacation and sick leave, or any other perquisites and benefits which are received by employees of JFS.

VIII. Insurance
In carrying out the duties of this contract and the Plan of Operation, the CONTRACTOR maintains res[p]onsibility for any claim, suit or proceeding brought agains[t] them or JFS directly related to services provided by the CONTRACTOR. CONTRACTOR is responsible for researching and acquiring Professional Liability Insurance. With prior notice to the Supervisor, up to one half of the annual premium for professional liability insurance can be billed to JFS for reimbursement. If the CONTRACTOR chooses to not carry Professional Liability Insurance, the CONTRACTOR will maintain sole responsibility for any claim, suit or proceeding brought against them, or against JFS directly related to services provided by the CONTRACTOR, on the issue of malpractice, or wrongdoing of any kind and agrees to hold JFS harmless in any such claim, suit or proceeding.

(Emphasis sic.)

{¶ 22} The third contract, exhibit 3, submitted by relator with her appeal was executed by relator and a JFS representative during June and July 2007. The contract covers the period July 1, 2007 through June 30, 2008.

{¶ 23} Appended to the third contract is again, a two-page document captioned "Help Me Grow Service Coordination and Home Visitation, PLAN OF OPERATION." (Emphasis sic.)

{¶ 24} The Plan of Operation executed June/July 2007 differs somewhat from the Plan of Operation executed in July 2003 and the Plan of Operation executed in April 2002. The Plan of Operation executed June/July 2007 states in its entirety:

I. Compensation
Services to be rendered include Help Me Grow Service Coordination and Home Visitation. CONTRACTOR will be compensated for time spent in preparation for or follow-up to client contact, direct or indirect client contact, data entry, clinical supervision, related meetings, required reporting or training, or other time as authorized and approved by the

Clinical Supervisor. CONTRACTOR will be compensated at a rate of $32.30 per hour. Hours of service provided and charged by the CONTRACTOR will be approximately 40 hours per week and shall not exceed a total of two thousand (2000) hours during the term of this contract. Hours of service billed should be rounded to the nearest quarter hour. The hourly rate of $32.30 shall be the total compensation paid for all services provided by and expenses of the CONTRACTOR. JFS may, as it deems necessary, require the CONTRACTOR to furnish documentation substantiating the CONTRACTOR'S cost of providing services under this contract.

II. Expenses

Other expenses related to the provision of services performed under this contract, such as purchasing books, toys or other developmental supplies, will be submitted to JFS prior to the purchase on a JFS Encumbrance Request form. If the CONTRACTOR is authorized to purchase supplies or equipment, the CONTRACTOR will submit the original receipt and description of the expense on a JFS Expense Form for reimbursement. CONTRACTOR will use a JFS tax exempt form for purchases, as sales tax will not be reimbursed. JFS will not pay a mark-up to the CONTRACTOR for supplies or equipment purchased by the CONTRACTOR.

III. Space/Equipment

JFS may furnish office space, office equipment and access to computers as needed to facilitate services to clients and to JFS. All equipment must remain on JFS premises unless otherwise agreed to by JFS. JFS may require the CONTRACTOR to use specific supplies such as program stationary at no expense to the CONTRACTOR. When working at JFS, Contractor agrees to conform to the professional standards and policies applicable to JFS staff including appearance, building usage and safety.

IV. Supervision

The CONTRACTOR will receive a minimum of four hours of Clinical Supervision on a monthly basis from a Clinical Supervisor designated by JFS. Clinical Supervision will occur through case reviews and by individual consultation. The CONTRACTOR agrees to follow the recommendations and guidance of the Clinical Supervisor. The CONTRACTOR agrees to provide a monthly plan of action detailing the goals

and activities the CONTRACTOR will achieve during that month. The CONTRACTOR will receive program and administrative supervision from a Supervisor designated by JFS. The Supervisor will oversee the provisions of the Contract, the Plan of Operation, the monthly plan of action, policies, procedures and any related administrative tasks.

V. Training
CONTRACTOR agrees to attend any training required by JFS, ODJFS, or ODH related to the provision of services under this contract.

VI. Reporting and Data Entry
CONTRACTOR agrees to comply with all reporting requirements of JFS, ODHS, ODH or Family First Council. CONTRACTOR also agrees to enter data into the Early Track system, as required by the program, or to submit data for entry into the Early Track system, if appropriate.

VII. Independent Contractor
CONTRACTOR is employed as an independent contractor, not as an employee of the Geauga County job and Family Services. Accordingly, the CONTRACTOR hereby acknowledges that JFS will not provide insurance, worker's compensation, medical benefits, vacation and sick leave, or any other perquisites [sic] and benefits which are received by employees of JFS.

VIII. Insurance and Indemnification
In performing the duties of this contract and the Plan of Operation, the CONTRACTOR maintains responsibility for any claim, suit or proceeding brought against them or JFS directly related to services provided by the CONTRACTOR. If the CONTRACTOR chooses to not carry Professional Liability Insurance, the CONTRACTOR will maintain sole responsibility for any claim, suit or proceeding brought against them, or against JFS directly related to services provided by the CONTRACTOR, on the issue of malpractice, or wrongdoing of any kind and agrees to hold JFS harmless in any such claim, suit or proceeding.

(Emphasis sic.)

{¶ 25} 9. With the appeal of the April 30, 2014 senior staff determination (General Counsel's April 30, 2014 letter), relator also submitted regulations published by the Internal Revenue Service ("IRS") regarding independent contractor status.

{¶ 26} 10. By letter dated August 19, 2014, pursuant to Ohio Adm.Code 145-1-11, OPERS assigned relator's appeal to a hearing examiner.

{¶ 27} 11. On October 24, 2014, the hearing examiner conducted a prehearing telephone conference with the parties.

{¶ 28} 12. On January 7, 2015, the hearing examiner held an evidentiary hearing. The hearing was recorded and transcribed for the record. The transcript is 275 pages in length.

{¶ 29} 13. Prior to the January 7, 2015 hearing, relator and JFS, through counsel, agreed to a stipulation of facts which presents 25 enumerated paragraphs:

> [One] Deborah W. Pruce was hired as a "Help Me Grow" home visitor on or about April 15, 2002. She signed her first contract with Geauga County Job and Family Services ("JFS") as a "contractor" for JFS on or about April 14, 2002. The compensation agreement was set forth in the Plan of Operation. * * * Mrs. Pruce acknowledged in all the JFS contracts for the period of April 15, 2002 through January 21, 2009 that she was hired as an independent contractor without benefits received by employees of JFS and was responsible for obtaining professional liability insurance if she desired coverage.
>
> [Two] She was compensated at the rate of $25.00 per hour plus reimbursement for mileage and for other expenses incurred that were necessary to perform her job.
>
> [Three] JFS has its principal office at 12480 Ravenwood Drive, Munson Township, Geauga County, Ohio.
>
> [Four] JFS provided a furnished office at that location with a telephone, separate telephone number to her desk, and computer, use of JFS copy and fax machines, and other necessary items ("tools") to perform her job.
>
> [Five] Mrs. Pruce entered client data and records of visits into the Early Track program, a proprietary software system installed on the JFS computers provided to the contractors.

[Six] JFS provided clinical and administrative supervision of the contractors.

[Seven] Reimbursement for mileage and other expenses by JFS was required to be submitted on a "JFS expense form" with the original receipts.

[Eight] JFS acknowledged that it was responsible for administering the Help Me Grow ("HMG") program and providing visitation services under a funding contract with the Geauga County Family First Council ("FFC"). Funds for HMG were provided by the State of Ohio.

[Nine] On or about July 1, 2003, Mrs. Pruce signed another contract, * * * which added the following conditions to which she agreed:

Compliance with the requirements imposed upon JFS
Preparation of detailed records including date of service, time of service, family served, time for appointment preparation, follow-up, and reporting data was entered into the Early Track system
Payment at her hourly rate for preparation of JFS/HMG reports required by funding sources and for attendance at training programs
Preparation of itemized invoices which detailed her time
Participation in JFS evaluation of the program
Compliance with reporting child abuse, neglect or criminal activity required by public agencies and its employees under Ohio law (§2151.421 O.R.C.)
Participation in clinical supervision of eight hours per month by a JFS employee, including case reviews and individual consultation
Administrative supervision by the HMG supervisor [Gina Shultz, a JFS employee]
Mrs. Pruce was required to visit families to perform her job functions. Occasionally she met with families at the JFS offices on Ravenwood Drive.

[Ten] She was not permitted to assign the contract nor hire assistants without prior written JFS approval. Her work was supervised by two JFS employees, Nancy Seelbach, Program Coordinator, and Gina Schultz, her supervisor. She received a yearly IRS Form 1099 for amounts paid to her.

[Eleven] Mrs. Pruce was reimbursed for mileage at the same rate as Geauga County employees. If she needed supplies or materials not available at JFS offices on Ravenwood Drive, she was provided with a sales tax exemption form to purchase the items.

[Twelve] JFS and Mrs. Pruce signed annual contracts pursuant to which she provided continuous uninterrupted service to JFS under the HMG program. The contracts, with a few exceptions noted below, were substantially similar * * *.

[Thirteen] In 2007, JFS issued RFP's for service coordinator/home visitor and family support specialist, * * * and a legal notice was published * * *.

[Fourteen] JFS hired the same contractors on or about July 1, 2007, * * *. Deborah's hours of service were the same, approximately 40 hours per week not to exceed 2,000 during the term of the contract, and she was paid $32.30 per hour Travel expense reimbursement was eliminated. The contractor was required to purchase professional liability insurance coverage.

[Fifteen] The contract was extended through June 30, 2009, with the rate of compensation reduced from $32.30 per hour to $30.25 per hour, but the mileage reimbursement was restored depending upon the number of families served.

[Sixteen] On December 30, 2008, Mrs. Pruce was notified by Tim Taylor, Executive Director of JFS, that her contract was terminated effective January 30, 2009.

[Seventeen] The contract between JFS and the Geauga County Family First Council terminated on the same date.

[Eighteen] Effective February 1, 2009, the Geauga County Family First Council contracted with the Geauga County Board of Mental Retardation and Developmentally Disabled ("GCBDD") for funding and administration of the HMG program.

[Nineteen] Deborah Pruce was hired as an employee of GCBDD with full benefits on February 2, 2009 * * * and has continued her employment to the present time. In addition to a salary and benefits, she is reimbursed for mileage.

GCBDD provides office space, office equipment and supplies. She continues to enter family service data into the Early Track software system. Mrs. Pruce submits timesheets on the same forms she used as a contractor for JFS.

[Twenty] Nancy Seelbach, who is an employee of JFS, continued as the program coordinator of HMG.

[Twenty-one] FFC contracted with GCBDD for HMG services to the present time.

[Twenty-two] Mrs. Pruce was not on the JFS payroll and did not have an employee file.

[Twenty-three] Under her contract, Mrs. Pruce was not eligible for vacation or sick time, and therefore did not accrue sick or vacation time.

[Twenty-four] Mrs. Pruce did not maintain a time sheet in the same manner as JFS employees, and she was not trained on tracking her time for payroll purposes.

[Twenty-five] The HR department did not conduct an orientation session with Mrs. Pruce, as was done with new JFS employees.

{¶ 30} 14. On March 31, 2015, the hearing examiner issued her 14-page Report and Recommendation ("R & R"). The hearing examiner's R & R is appended as an exhibit to this magistrate's decision.

{¶ 31} 15. By letter dated April 2, 2015, OPERS "Executive Legal Assistant," Maria J. Myers provided to relator a time-stamped copy of the R & R. The letter further advised:

Pursuant to the provisions of Ohio Administrative Code 145-1-11(C), you may file written objections to this Report and Recommendation. The written objections must not exceed 15 pages in length. The objections must be actually received and filed at OPERS' office within 15 days of the date of the issuance of the Report and Recommendation.

If a written objection is filed, the OPERS Board may permit the parties to make a personal appearance before the Board prior to its final review of the appeal, and such notice of the personal appearance will be sent under separate cover.

16. Relator did not file objections to the March 31, 2015 R & R.

17. By letter dated September 28, 2015, Myers informed relator:

Per Ohio Administrative Rule 145-1-11(C)(2), no personal appearance before the Board is permitted by the parties at this meeting as no objections were filed. We will notify you in writing of the Board's decision to this matter.

{¶ 32} 18. At its December 16, 2015 meeting, the board voted unanimously to accept the findings of fact and conclusions of law issued by the hearing examiner in her R & R.

{¶ 33} The board's December 16, 2015 minutes state:

Ms. Laura Parsons reported on the membership determination appeal in the matter of Deborah Pruce and Geauga County Department of Job and Family Services. The Board is being asked to consider whether Ms. Pruce was a public employee eligible for OPERS membership for her service with the Geauga County Department of Job and Family Services from April 15, 2002 through January 31, 2009.

The hearing examiner prepared a March 31, 2015 Report and Recommendation to the Board with findings of fact and conclusions of law. Neither party filed written objections to the Report and Recommendation. Because no party filed objections, neither party is permitted to make a personal appearance before the Board.

{¶ 34} 19. On November 16, 2016, relator, Deborah Pruce, filed this mandamus action.

Conclusions of Law:

{¶ 35} The issue is whether the OPERS board abused its discretion in determining that relator was not a public employee of JFS for the period April 15, 2002 through January 31, 2009, but was instead an "independent contractor" as defined by former Ohio Adm.Code 145-5-15(A)(2) and currently by Ohio Adm.Code 145-1-42(A)(2).

{¶ 36} Finding no abuse of discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

{¶ 37} Effective January 1, 2003 and currently, Ohio Adm.Code 145-1-41(A) provides:

In making any determination as to whether an individual is a contract employee or independent contractor under section 145.036 of the Revised Code, the public employees retirement board shall review, including but not limited to, the elements described in paragraphs (A)(1) and (A)(2) of rule 145-1-42 of the Administrative Code.

{¶ 38} Effective January 1, 2003 and currently, Ohio Adm.Code 145-1-42(A) provides:

(A) For purposes of Chapter 145. of the Revised Code, and Chapter 145-1 of the Administrative Code, the following definitions apply:

(1) "Contract employee" means an individual who:

(a) Is a party to a bilateral agreement which may be a written document, ordinance, or resolution that defines the compensation, rights, obligations, benefits and responsibilities of the individual as an employee;

(b) Is paid earnable salary at a specific periodic rate for services personally performed for the public employer and who appears on the employer's payroll;

(c) Is eligible for workers' compensation or unemployment compensation;

(d) May be eligible for employee fringe benefits such as vacation or sick leave;

(e) Is controlled or supervised by personnel of the public employer as to the manner of work; and

(f) Should receive an Internal Revenue Service form W-2 for income tax reporting purposes.

(2) "Independent contractor" means an individual who:

(a) Is a party to a bilateral agreement which may be a written document, ordinance, or resolution that defines the compensation, rights, obligations, benefits and responsibilities of both parties;

(b) Is paid a fee, retainer or other payment by contractual arrangement for particular services;

(c) Is not eligible for workers' compensation or unemployment compensation;

(d) May not be eligible for employee fringe benefits such as vacation or sick leave;

(e) Does not appear on a public employer's payroll;

(f) Is required to provide his own supplies and equipment, and provide and pay his assistants or replacements if necessary;

(g) Is not controlled or supervised by personnel of the public employer as to the manner of work; and
(h) Should receive an Internal Revenue Service form 1099 for income tax reporting purposes.

{¶ 39} Prior to January 1, 2003, the provisions of current Ohio Adm.Code 145-1-42, as above quoted, were found at 145-5-15 which was repealed effective January 1, 2003.

{¶ 40} Some observations are in order. Ohio Adm.Code 145-1-41(A) provides instructions as to how the adjudicator shall apply the "elements" described in paragraphs (A)(1) and (2) of rule 145-1-42.

{¶ 41} Thus, applying Ohio Adm.Code 145-1-41(A)'s instructions to the eight [(a)—(h)] elements listed at Ohio Adm.Code 145-1-42(A)(2), it is clear that the adjudicator is instructed to "review" all eight of the elements listed under the caption "Independent contractor." However, the adjudicator is "not limited" to the eight elements described. Nowhere does Ohio Adm.Code 145-1-41(A) instruct the adjudicator that all eight of the elements must be satisfied (by some evidence) in order to reach a conclusion that the individual is an "Independent contractor."

{¶ 42} Given the above reading of Ohio Adm.Code 145-1-41(A) and 145-1-42(A), it is clear that relator is incorrect in asserting here that "all eight" of the elements must be met in order for the adjudicator to conclude that the individual is an independent contractor. (Reply brief at 10.) The statute is silent as to whether any number of elements must be met in order to find independent contractor status.

{¶ 43} If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary. *State ex rel. Burrows v.*

*Indus. Comm.*, 78 Ohio St.3d 78, 81 (1997).  Unambiguous statutes are to be applied according to the plain meaning of the words used.  *Id.*  Courts are not free to delete or insert other words.  *Id.*

{¶ 44} It can be noted that elements (a) through (g) are interconnected by semicolons.  However, elements (g) through (h) are interconnected by a semicolon followed by the word "and."  According to relator, this court must place the word "and" following all the semicolons that interconnect elements (a) through (g).  In effect, relator is inviting this court to insert words that are not in the statute.  This court should decline relator's invitation.

{¶ 45} It can be further noted that Ohio Adm.Code 145-1-42(A)(1) and (2) fails to establish the weight to be given by the adjudicator in his or her review of the eight elements listed under "Independent contractor."  The statute does not state that each element must be given equal weight as to the other elements.

### Relator's Concessions

{¶ 46} In her brief, relator concedes that four of the eight "elements" set forth at Ohio Adm.Code 145-1-42(A)(2) that the OPERS board must review are satisfied. (Relator's brief at 24.)  That is, relator concedes there is sufficient (some) evidence to establish "elements" (c),(d), (e), and (h) as follows:

> (c) Is not eligible for workers' compensation or unemployment compensation;
>
> (d) May not be eligible for employee fringe benefits such as vacation or sick leave;
>
> (e) Does not appear on a public employer's payroll;
>
> * * *
>
> (h)  Should receive an Internal Revenue Service form 1099 for income tax reporting purposes.

{¶ 47} According to relator, "JFS, the public employer, failed to prove the other four requirements."  (Relator's brief at 24.)

{¶ 48} In her reply brief, relator states:

> In the instant matter, the interpretation of OAC 145-1-42(A)(2)(c), (f) and (g) was not reasonable when the Relator presents clear and convincing evidence that the three subsections have not been satisfied, and Respondent's failed to present "some evidence" in support thereof.

(Reply brief at 10-11.)

{¶ 49} Thus, in her reply brief, relator further concedes that only three "elements" have not been satisfied. However, relator has previously conceded that element (c), regarding workers' compensation and unemployment compensation, has been satisfied. Thus the magistrate concludes that relator is only challenging the satisfaction of elements (f) and (g).

## Ohio Adm.Code 145-1-42(A)(2)(f)

{¶ 50} As earlier noted, element (f) under Ohio Adm.Code 145-1-42(A)(2) states that the individual "[i]s required to provide his own supplies and equipment, and provide and pay his assistants or replacements if necessary."

{¶ 51} The hearing examiner seems to find that there is but one element toward independent contractor status, and that element is Ohio Adm.Code 145-1-42(A)(2)(f). In that regard, at paragraph 5 of her "Findings of Fact," the hearing examiner finds "JFS provided Ms. Pruce with an office, telephone, computer, and supplies." Under "Analysis," the hearing examiner determined "[t]hroughout Ms. Pruce's entire tenure as a service provider for HMG, JFS provided her with an office, desk, telephone, computer and supplies."

{¶ 52} In fact, JFS was required "to provide office space, telephone access, computer and copier access and office supplies." (Footnote omitted.)

{¶ 53} However, that JFS provided supplies and equipment rather than relator providing her own does not mandate a finding that relator was not an independent contractor.

## Ohio Adm.Code 145-1-42(A)(2)(g)

{¶ 54} As earlier noted, element (g) under Ohio Adm.Code 145-1-42(A)(2) states that the individual "[i]s not controlled or supervised by personnel of the public employer as to the manner of work."

{¶ 55} At the March 31, 2015 hearing before the hearing examiner, JFS social services director Gina Schultz testified at length. Apparently, the hearing examiner found Ms. Schultz to be a credible witness because the hearing examiner relied extensively on her testimony in rendering findings regarding element (g) under Ohio Adm.Code 145-1-42(A)(2).

{¶ 56} In her R & R, the hearing examiner extensively summarized Schultz's testimony relating to the supervision issue set forth at Ohio Adm.Code 145-1-42(A)(2)(g):

> As the administrative supervisor, she paid close attention to the rules and mandates of the program, the systems established by the program and the funding status. ODH required the clinical supervisor to provide a minimum of eight hours of clinical supervision/guidance to each HMG service provider each month. This requirement, which included case reviews and individual consultation, was fulfilled by meeting with the providers both individually and in a group setting. Ms. Schultz would review new rules issued by ODH and discuss ways to get more children involved in HMG and to secure the services needed. Ms. Schultz testified that she did evaluate "the manner in which the independent contractors' cases were managed."
>
> At some point during the time period that Ms. Pruce had contracts with JFS, ODH required that the service providers, such as Ms. Pruce, also be evaluated to ensure that they had their service credentials, and mandatory training hours. Therefore, Ms. Schultz met annually with Ms. Pruce to review these matters. Ms. Schultz testified that it was not a performance evaluation. Moreover, Ms. Schultz was also required to observe Ms. Pruce in the field. This observation was part of the mandatory credentialing process.
>
> In addition to her duties for HMG, Ms. Schultz also supervised the social workers, who were employees of JFS. She stated that the supervision received by Ms. Pruce was different than that received by JFS employee social workers. For example, the social workers needed to let Ms. Schultz know where they were at all times. In addition, she checked their desk calendars and the sign-in and sign-out boards. If they were going to be late or sick, they needed to contact her. Any vacation time or time off had to be approved. In contrast, Ms. Schultz did not monitor the "comings and goings" of Ms. Pruce, who was free to arrange her own

schedule, was not required to check in or out, and was not required to come into the JFS offices on a daily basis. She was not required to work specific days, unless there were team meetings, which were mandated by ODH. Furthermore, Ms. Pruce was not required to spend a set number of hours at the JFS offices. At times, Ms. Pruce worked from home. Moreover, the contract service providers, such as Ms. Pruce, were not required to go to JFS staff meetings. JFS employees, however, were required to attend these meetings.

**{¶ 57}** Significantly, relator does not contend that the hearing examiner's R & R regarding Schultz's testimony is not supported by the hearing transcript.

**{¶ 58}** Here, relator and respondent spar over the relevancy of Schultz's testimony regarding comparison of her supervisory control over her social services caseworkers.

**{¶ 59}** In its brief, respondent OPERS states:

In her Report and Recommendation, the Hearing Examiner stated that the level of supervision Relator received was mandated by the Ohio Department of Health under the grant requirements, and that the supervision was different than the supervision JFS social worker employees received. * * * At the OPERS hearing, Gina Schultz, JFS Social Services Director, testified that she had more control over the social services caseworkers that she supervised than she had over the Help Me Grow independent contractors.

(Respondent OPERS' brief at 14.)

**{¶ 60}** In her reply brief, relator argues:

Respondent OPERSB [sic] also argues that the supervision of JFS social worker employees was different than that of the HMG home visitors and cites the hearing examiner's report in support. Evidence of more control and supervision over social services caseworkers is not "some evidence" of no control or supervision over Relator and the HMG home visitors.

(Relator's reply brief at 9.)

**{¶ 61}** The magistrate disagrees with relator's suggestion that Schultz's testimony comparing the differences in supervision level is irrelevant to the supervision issue here. Clearly, as indicated by the R & R, the Help Me Grow services coordinators were under

much less supervision than the social services caseworkers. Moreover, relator's suggestion that there must be no control or supervision is incorrect. *State ex rel. Nese v. State Teachers Retirement. Bd. of Ohio,* 136 Ohio St.3d 103, 2013-Ohio-777.

**{¶ 62}** Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).

RECEIVED
LEGAL

**THE OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM**     APR 0 2 2015
277 East Town Street
Columbus, Ohio 43214

IN THE MATTER OF:                                    Administrative Proceedings

Deborah W. Pruce
     Petitioner/Claimant
                                                     Mary K. Crawford,
And                                                  Hearing Examiner

Geauga County Department                             March 31, 2015
Of Job and Family Services
     Respondent

## Report and Recommendation

---

Appearances: **For the Ohio Public Employees Retirement System**: Michael DeWine, Attorney General, by John Danish, Assistant Attorney General, Pension Counsel, 30 E. Broad Street, 15th Floor, Columbus, Ohio, 43215.
**For the Petitioner/Claimant**: James M. Gillette, PNC Bank Building, 117 South Street, Suite 208, Chardon, Ohio 44024. Phone: (440) 286-7195.
**For the Respondent:**  Susan Wieland,  Assistant County Prosecutor, Office of Geauga County Prosecutor, 231 Main Street, Suite 3A, Chardon, Ohio 44024. Phone: (440) 279-2109.

---

### Nature of the Case

The Petitioner, Deborah Pruce, has asked the Ohio Public Employees Retirement System (OPERS) Board to reverse a decision made at the administrative level, where OPERS senior staff members determined that Ms. Pruce was not a public employee of the public employer, Geauga County Department of Job and Family Services (JFS), and not entitled to OPERS membership or service credit while working pursuant to contracts during the time period April 15, 2002 through January 31, 2009.

In its review of the information provided, the senior staff analyzed the information provided against the definition of "independent contractor" in the Ohio Administrative Code.

1

Specifically, Ohio Admin. Code 145-5-15,[1] as it existed during the time in question, defined "independent contractor" as an individual who:

   a. is a party to a bilateral agreement which may be a written document, ordinance, or resolution that defines the compensation, rights, obligations, benefits and responsibilities of both parties;

   b. is paid a fee, retainer or other payment by contractual arrangement for particular services;

   c. is not eligible for worker's compensation or unemployment compensation;

   d. may not be eligible for employee fringe benefits such as vacation or sick leave;

   e. does not appear on a public payroll;

   f. is required to provide his own supplies and equipment, and provide and pay his assistants if necessary;

   g. is not controlled or supervised by personnel of the public employer as to the manner of work; and

   h. should receive an Internal Revenue Service form 1099 for income tax reporting purposes.

Factors which were significant to OPERS senior staff included the fact that Ms. Pruce was a party to bilateral agreements in which she was specifically referred to as "contractor." The Plan of Operation incorporated into the contracts set forth the duties to be performed and the hourly rate of compensation. Furthermore, this document specifically stated that Ms. Pruce was not an employee of JFS and was not eligible to receive fringe benefits such as health insurance, vacation or sick leave, or worker's compensation or "any other benefit offered to JFS employees." Moreover, she did not appear on a public payroll, but was required to submit invoices for work performed and maintain financial records to support these invoices. Moreover, she received a 1099 form for income tax reporting purposes. (Certified Record, pp. 249-51)

OPERS Senior Staff also considered the fact that Ms. Pruce was responsible to obtain professional liability insurance and be responsible for any claim or suit brought against JFS based upon her actions/omissions. Moreover, she was permitted to subcontract with prior approval by JFS of the subcontractor's credentials. Furthermore, the Senior Staff found that the supervision by JFS was "appropriate given the nature of the services performed." (Record of Proceedings, p. 250)

------

[1] In 2003, this section of the Ohio Administrative Code was renumbered as Ohio Admin. Code 145-1-42. The definition of "independent contractor," however, remained the same for the entire period of Ms. Pruce's service.

Although JFS provided office space, equipment and supplies, the senior staff determination found that "these factors alone are not determinative as the remaining requirements of Admin. Code 145-5-15 have been met." (Certified Record, p. 250)

**Summary of the Evidence**

Claimant, who was represented by counsel, presented her sworn testimony. JFS called the following witnesses on its behalf: Tim Taylor, executive director of JFS until his retirement in October 2014, Nancy Seelbach, coordinator of Geauga Family First Council, Gina Schultz, social services director of JFS, and Kim Mullet, fiscal officer of JFS. The parties submitted 33 Joint Exhibits, including a Stipulation of Facts, which is marked as Joint Exhibit 33. OPERS submitted the Certified Record of Proceedings. A court reporter was present. All testimony and exhibits admitted in the hearing in this matter, whether or not specifically referenced in this Report, were thoroughly reviewed and considered by the hearing officer prior to the entry of the findings of fact, conclusions of law and recommendation set forth below. (Tr., p. 12)

*Help Me Grow*

In 2002, Ohio was developing a program called Help Me Grow (HMG) as a way to address its responsibility to provide early intervention services. The program identified children with delays and risks and provided in home and supportive services for the children and their families. (Tr., pp. 18-19)

HMG, which was funded by state and federal funds, was overseen by the Ohio Department of Health (ODH), which awarded a grant to Family First Council[2] (Family First) to monitor the funding for the HMG programs throughout the State. Family First in each county was the entity through which the funds flowed into that county and that oversaw ODH's requirements for HMG. (Tr., pp. 95-96)

Family First issued a Request for Proposal (RFP) for provision of services under the HMG grant in Geauga County. JFS's proposal was accepted and Family First and JFS entered in to a contract. Nancy Seelbach, the Family First coordinator who oversaw the Geauga County HMG program, testified that there were numerous requirements set forth by ODH for the HMG

---

[2] Although Family First Council is a statutorily created entity; it is not an agency. Therefore, it must be under the auspices of a county agency. JFS is the administrative agency for Family First in Geauga County. (Tr., pp. 91, 94).

3

program. Some of these were outlined in an agreement signed by ODH, Family First and JFS.[3] ODH also issued many guidance documents adding and/or changing requirements, since HMG was an ever-evolving program. Ms. Seelbach stated that if the requirements were not met, Family First would lose the funding for the program. (Tr., pp. 96, 98-99, 104)

There were requirements for credentials, training and supervision of service providers, including independent contractors. All professional service providers were required to comply with their licensure requirements. The HMG Personnel Standards Policy set forth the required hours of training, subject matter of such training and specific clinical supervision. This supervision, which was to be provided to independent contractors on how to handle cases, was to be a certain number of hours per month. There were also specific requirements regarding paper work, accurate data collection and entry into the Early Trak computer system. Early Trak was a proprietary software system provided by ODH to Family First to track information for HMG. This system was internet based and could be accessed from any computer.[4] (Tr., pp. 86, 102-06, 109, 118, 150-52)

*The Contracts*

Tim Taylor, the executive director of JFS until his retirement in 2014, testified that JFS used the following advertisements and/or RFPs in order to enter into contracts with service providers for the HMG program:

     a.     In February 2002, JFS advertised for a child development specialist to "to work as an independent contractor to provide service coordination, developmental screenings, and home visits to families with children ages birth to three who have or are at risk for a developmental delay." (emphasis added) (Tr., pp. 23-26, 211-12; Jt. Exhibits 30, 31)

     b.     In November 2004, JFS advertised again for a service coordinator to "work as an independent contractor to provide service coordination, developmental screenings and home visits primarily to families with children ages 0-3 with developmental delays or disabilities." (emphasis added) (Tr., pp. 27-28; Jt. Exhibit 28)

---

[3] The parties submitted Joint Exhibit 32 as an example of the agreement entered into by ODH, Family First and JFS.
[4] Ms. Pruce testified that she was unaware that she could access Early Trak from the internet. She thought she could only access it at the JFS offices. (Tr., p. 231)

c.    In April 2007 and September 2007, JFS issued formal RFPs for service coordinator/home visitors. These RFPs specifically stated: "This RFP will not lead to employment with Job and Family Services." (emphasis added)  (Tr., pp. 26-29; Jt. Exhibit 27, p. 1; Certified Record p. 101)

Ms. Pruce was one of the contractors selected  and she served pursuant to a series of contracts continuously from April 15, 2002 through January 31, 2009.[5]  In this capacity, Ms. Pruce coordinated services for children with medical diagnoses, disabilities and developmental delays. She performed developmental screenings and ensured that the children were evaluated and assessed to determine their eligibility for the HMG program. She also worked with JFS staff to determine if the families were eligible for services such as food stamps, Medicaid, WIC, and to get the medical and social support they needed. She also participated in play groups for children and support groups for the families. (Tr., pp. 29, 31-32,  218-19; Jt. Exhibit 33, p. 1)

The contracts referred to Ms. Pruce as "Contractor" and required her to submit billings which should include "dates of service, family served, time of service, and total cost of service being billed.  Bills must delineate actual direct service time from preparation, follow-up, reporting and training time." Payment to the contractor would be made by JFS within 30 days of receipt of the required documentation.  The contractor was required to "maintain and keep financial and supporting documents, statistical records and other records pertinent to the services for which billing was submitted." (Tr., pp. 34-35; Certified Record pp. 57, 58)

Under the contracts, Ms. Pruce was authorized to hire subcontractors if JFS approved the qualifications of the subcontractor.  Furthermore, the contract stated that she was responsible to JFS for the performance of any subcontractor. (See, eg., Certified Record, p.  58)

Attached to each of the contracts was a Plan of Operation, which was incorporated into the contracts and included such terms as compensation, supervision, training, reporting requirements and indemnification.  Changes in the compensation package were negotiated with each new contract. Some of these changes included  an increased hourly rate, partial reimbursement of professional liability insurance, and reimbursement for some additional training. (Tr., pp. 35, 50)

---

[5] Copies of all the contracts were included in the Certified Record, with the exception of the period of January 1, 2003 to June 30, 2003. The parties agreed that there was a contract to cover this period of time and that Ms. Pruce worked pursuant to a contract continuously from April 15, 2002 to January 31, 2009. (Tr., pp. 59-50; Certified Record, pp. 18-99; 106-07)

5

The hourly compensation, which was negotiated between JFS and Ms. Pruce, ranged from $25.00 to $32.30 over the years of Ms. Pruce's contracts. All of the contracts, with the exception of the first, set a maximum number of hours.[6] Moreover, she was not prohibited from having other employment while under contract with JFS. Ms. Pruce testified that she had a part time job as a nurse during one of years she was under contract with JFS. (Tr., pp. 35, 37, 41, 222; Certified Record, pp. 60, 66, 72, 78, 84, 90, 98, 106)

All the Plans of Operation stated that the Contractor "is employed as an independent contractor, not as an employee of the Geauga County Job and Family Services. Accordingly, the Contractor hereby acknowledges that JFS will not provide insurance, worker's compensation, medical benefits, vacation and sick leave, or any other perquisites and benefits which are received by employees of JFS." Furthermore, Ms. Pruce was not eligible for unemployment benefits. The Contractor was responsible for purchasing professional liability insurance and indemnifying JFS for any claims or suits related to services provided by the Contractor. In later contracts, Ms. Pruce negotiated that she be reimbursed for part of the cost of the professional liability insurance. (Tr., pp. 39-40, 252, 254; *See, eg.,* Certified Record, p. 67)

Under the terms of the contracts, JFS agreed to provide office space,[7] telephone access, computer and copier access and office supplies. These expenses were then billed "back to Family First as [JFS's] cost to the council for providing services."[8] Ms. Pruce had a key to the JFS offices and also had an email address, which was an Ohio Department of Job and Family Services address, not a county JFS address. (Tr., pp. 78-81, 89-90, 223-29)

Mr. Taylor explained that JFS had a responsibility with all its contracts to monitor services and billings. With the HMG program there were many additional requirements and restrictions that needed to be complied with and monitored. (Tr., pp. 72-73)

Gina Schultz became the administration and clinical supervisor of HMG in 2004 or 2005. As the administrative supervisor, she paid close attention to the rules and mandates of the program, the systems established by the program and the funding status. ODH required the clinical supervisor to provide a minimum of eight hours of clinical supervision/guidance to each

---

[6] The number of maximum hours varied. In 2003, the maximum number of hours was 1040; this number increased to 2020 in 2004 and then was reduced to 2000 in 2007. (Tr., pp. 60-62)

[7] It is noted that even after JFS no longer had a contract with Family First to oversee the HMG program, office space was provided at JFS for HMG.

[8] Before the HMG contracts were renewed, Mr. Taylor and the fiscal officer would calculate the space cost, or square footage, used for HMG purposes and charge this amount to Family First. (Tr., p. 199)

HMG service provider each month. This requirement, which included case reviews and individual consultation, was fulfilled by meeting with the providers both individually and in a group setting. Ms. Schultz would review new rules issued by ODH and discuss ways to get more children involved in HMG and to secure the services needed. Ms. Schultz testified that she did evaluate "the manner in which the independent contractors' cases were managed." (Tr., pp. 92, 123-129, 237-38)

At some point during the time period that Ms. Pruce had contracts with JFS, ODH required that the service providers, such as Ms. Pruce, also be evaluated to ensure that they had their service credentials, and mandatory training hours. Therefore, Ms. Schultz met annually with Ms. Pruce to review these matters. Ms. Schultz testified that it was not a performance evaluation. Moreover, Ms. Schultz was also required to observe Ms. Pruce in the field. This observation was part of the mandatory credentialing process. (Tr., pp. 159, 164-65)

In addition to her duties for HMG, Ms. Schultz also supervised the social workers, who were employees of JFS. She stated that the supervision received by Ms. Pruce was different than that received by JFS employee social workers. For example, the social workers needed to let Ms. Schultz know where they were at all times. In addition, she checked their desk calendars and the sign-in and sign-out boards. If they were going to be late or sick, they needed to contact her. Any vacation time or time off had to be approved. In contrast, Ms. Schultz did not monitor the "comings and goings" of Ms. Pruce, who was free to arrange her own schedule, was not required to check in or out, and was not required to come into the JFS offices on a daily basis. She was not required to work specific days, unless there were team meetings, which were mandated by ODH. Furthermore, Ms. Pruce was not required to spend a set number of hours at the JFS offices. At times, Ms. Pruce worked from home. Moreover, the contract service providers, such as Ms. Pruce, were not required to go to JFS staff meetings. JFS employees, however, were required to attend these meetings. (Tr., pp. 133-36, 179-80, 239, 256-57, 267)

Pursuant to the contracts, the HMG contractors, such as Ms. Pruce, agreed to attend such training as required by ODH or the Ohio Department of Job and Family Services as it related to the provision of services under the contract. In order to maintain her service coordinator certification through ODH, Ms. Pruce was required to have twenty hours of training every two years. Since this was mandatory training specific to the HMG program, there was no cost for the training. Pursuant to the terms of her contracts with JFS, Ms. Pruce was paid for attending the

7

training and for her mileage. Some of the contracts also reimbursed her for a limited amount of additional training. (Tr., pp. 172-73, 219-20, 222, 247-48)

Ms. Pruce did not appear on any employee master report for JFS and never appeared on JFS's payroll. Rather, Ms. Pruce was paid by a voucher for a vendor. Kim Mullet, fiscal officer for JFS, testified that the payment process for vendor vouchers is very different than that for payroll. (Tr., pp. 49, 189-92; Jt. Exhibits 24, 25)

Ms. Pruce submitted an invoice with a detailed timesheet broken down in 15 minute increments for each day worked. Ms. Schultz reviewed these time sheets to monitor and balance the two different funding sources under HMG grant. She was checking to ensure that money was still available in the appropriate fund and that Ms. Pruce still had hours available under her contract. After the accuracy of the invoice was verified, it would be delivered, with a voucher cover sheet, along with vouchers for all other vendors, to the county auditor, where the vouchers were reviewed and audited. Then all the vouchers went to the county commissioners, who had to approve payment. The voucher cover sheet included a warrant number, the date, amount of the warrant and a "1099 Amount". At the end of the year, Ms. Pruce was given an IRS form 1099 for income tax purposes.[9] JFS employees, however, did not submit invoices for payment. Furthermore, Ms. Pruce's position did not appear on any table of organization of JFS. (Tr., pp. 138-39, 185, 189-92, 198; Jt. Exhibits 6, 7, 8, 9, 10, 11, 12, 13; Jt. Exhibit 33, pp. 2-3)

JFS paid for the licensure fees for social workers and other employees of JFS. Initially, It did not do so for Ms. Pruce. During later contracts, however, a portion of the premium costs were reimbursed as part of the compensation package. (Tr., pp. 50, 63, 67, 223)

Ms. Pruce was required to have her own vehicle to use for her work with JFS and was reimbursed for mileage at the same rate as JFS employees.[10] The agency did not pay for liability insurance for the car. (Tr., pp. 50-51, 76, 255; Jt. Exhibit 33, p. 3)

Ms. Pruce testified that as early as November 2003, she asked Mr. Taylor about becoming an employee rather than an independent contractor. He told her that HMG providers would not be made employees, but "he was doing his best to compensate [them] in other ways." Mr. Taylor explained that if she were to become an employee, the level of pay would be

---

[9] The 1099 forms showed that Ms. Pruce's earnings from April 15, 2002 through December 31, 2002 was $34,005, and in subsequent years ranged from $48,050 to $68,544. (Certified Record, pp. 174-89)
[10] During one contract year, Ms. Pruce negotiated for a higher hourly rate in lieu of mileage reimbursement. (Jt. Exhibit 33, p. 3)

8

drastically reduced. Both Nancy Seelbach and Gina Schultz also spoke with Ms. Pruce about her status as an independent contractor versus an employee. These conversations mainly concerned the difference in pay between the two positions. Ms. Schultz testified that when she became a supervisor in 2004/2005, she was making $14.00 an hour. Cost of all benefits was approximately 30 % of the salary; this figure included all benefits, hospitalization, worker's compensation, Medicare, and PERS contributions. Therefore, the cost to the county for a supervisor was $18.20 per hour. At the same time, Ms. Pruce was making $26.00 - $28.00 an hour as an independent contractor. (Tr., pp. 51-52, 106-07, 146-47, 202-04, 215-26)

During 2008, there were many changes in the HMG program and the oversight at the State level. The program was becoming more of a medical model and billing was changing to a Medicaid billing system. In addition, the types of services and ages of the children to be served were changing and JFS did not want to continue to provide the services under the new model. Therefore, the contract between JFS and Family First was terminated effective January 31, 2009, at which time Family First contracted with the Geauga County Board of Developmental Disabilities (GCBDD). In accordance with the terms of the contract, Ms. Pruce and the other independent contractors for the HMG program were informed that the contract would be terminated effective January 31, 2009. (Tr., pp. 53-55; Jt. Exhibit 33, pp. 3-4; Certified Record, p. 108)

On February 2, 2009, Ms. Pruce began working as an employee for the Geauga County Board of Developmental Disabilities as a service coordinator for HMG and has continued her employment to the present time. She testified that her current annual salary is approximately $42,000. Ms. Pruce, who submits time sheets similar to those she completed for JFS, receives a W-2 for income tax purposes. Furthermore, she receives full benefits from GCBDD. (Tr., pp. 243-45; Jt. Exhibit 33, p. 3; Certified Record, p. 190)

**Analysis**

In 1976, R.C. 145.03 was amended and exempted persons employed under a personal service contract from OPERS membership. The statute was subsequently revised to remove this broad exemption. As a result, in 1992, OPERS amended Ohio Admin. Code 145-15-15 and established factors to determine whether a person was a "contract employee," who is eligible for

9

OPERS coverage, or an "independent contractor," who is not eligible for coverage. These factors, which are the same as those promulgated in 1992, are currently listed in Ohio Admin. Code 145-1-42.

Ohio Admin. Code 145-1-41(A) states: "In making any determination as to whether an individual is a contract employee or independent contractor under 145.036 of the Revised Code, the public employees retirement board shall review, including but not limited to, the elements described in paragraphs (A)(1) and (A)(2) of the rule 145-1-42 of the Administrative Code."

The elements as set forth in the rule for an "independent contractor" are that the individual is:

 a. is a party to a bilateral agreement which may be a written document, ordinance, or resolution that defines the compensation, writes, obligations, benefits and responsibilities of both parties;

 b. is paid a fee or other payment by contractual arrangement for particular services;

 c. is not eligible for worker's compensation or unemployment compensation;

 d. may not be eligible for employee fringe benefits such as vacation or sick leave;

 e. does not appear on a public payroll;

 f. is required to provide his own supplies and equipment, and provide and pay his assistants if necessary;

 g. is not controlled or supervised by personnel of the public employer as to the manner of work; and

 h. should receive an Internal Revenue Service form 1099 for income tax reporting purposes.

The parties concur that Ms. Pruce was a party to a bilateral agreement which set forth the compensation, obligations, benefits and rights of the parties. Ms. Pruce was paid a specific negotiated hourly rate. She was not eligible for worker's compensation, unemployment compensation, or fringe benefits, such as vacation or sick leave. Furthermore, she did not appear on JFS's public payroll, but was paid by warrant, and received Internal Revenue Service Forms 1099 for income tax reporting purposes.

She was able to hire subcontractors, subject to approval of their credentials by JFS, and she was responsible for their performance. Furthermore, she was required to maintain professional liability insurance and indemnify JFS for any claims related to her services.

Throughout Ms. Pruce's entire tenure as a service provider for HMG, JFS provided her with an office, desk, telephone, computer and supplies. Moreover, the supervision she received

10

was that mandated by ODH under the HMG program requirements. This supervision was different than that received by JFS social worker employees. Unlike JFS employees, Ms. Pruce was able to set her own hours, case schedule and manner in which she handled her cases.

The Ohio Supreme Court has held that "as a practical matter, every contract for work reserves to the employer a certain degree of control to enable him to ensure that the contract is performed according to specifications." *State ex rel. Nese v. State Teachers Retirement Board*, 136 Ohio St.3d 103 (2013), citing *Gillum v. Indus. Comm.*, 141 Ohio St. 373 (1943) Therefore, some control is appropriate in independent contractor relationships. JFS's supervision was that mandated to ensure compliance with the HMG grant requirements.

In summary, comparing the elements set forth in Ohio Admin. Code 145-1-42 for an independent contractor with Ms. Pruce's position during the period April 15, 2002 through January 31, 2009, leads to the conclusion that Ms. Pruce was an independent contractor and, therefore, not eligible for OPERS membership.

**Findings of Fact**

To the extent any findings of fact constitute conclusions of law, they are submitted as such.

1. Deborah Pruce served as a service coordinator for the HMG program pursuant to contracts with JFS from April 15, 2002 through January 31, 2009. HMG is a state and federally funded program overseen by the Ohio Department of Health and administered by Family First, which entered into contracts with JFS to provide services under the program.

2. Ms. Pruce is seeking OPERS credit for the period of April 15, 2002 through January 31, 2009.

3. From April 15, 2002 through January 31, 2009, Ms. Pruce worked pursuant to a bilateral contract with JFS, which set forth the compensation, obligations, benefits and rights of the parties. Ms. Pruce was paid a specific hourly rate. She was not eligible for worker's compensation, unemployment compensation, or fringe benefits, such as vacation or sick leave. She did not appear on JFS's public payroll, but was paid by warrant, and received Internal Revenue Service Forms 1099 for income tax reporting purposes.

4. Under the bilateral contracts, Ms. Pruce was authorized to enter into subcontracts if JFS approved the qualifications of the subcontractor. Furthermore, the contract stated that Ms. Pruce was responsible to JFS for the performance of any subcontractor. Ms. Pruce was responsible for purchasing professional liability insurance and indemnifying JFS for any claims or suits related to services she provided.

5. JFS provided Ms. Pruce with an office, telephone, computer, and supplies.

6. The supervision Ms. Pruce received was that mandated by ODH under the HMG program requirements. This supervision was different than that received by JFS social worker employees. Unlike JFS employees, Ms. Pruce was able to set her own hours, case schedule and manner in which she handled her cases.

7. Effective February 2, 2009, Ms. Pruce became an employee of GCBDD and continues to serve as a service coordinator for the HMG program.

## Conclusions of Law

To the extent any conclusions of law constitute findings of fact, they are submitted as such.

1. JFS is a public employer, as defined by R.C. 145.01(D).

2. The burden of proof, by a preponderance of the evidence, is on the public employer, JFS, to establish that Ms. Pruce was an independent contractor and, therefore, exempt from OPERS membership for the period of April 15, 2002 through January 31, 2009.

3. Pursuant to R.C. 145.01(A), to be a public employee, an individual must be an employee of a public employer, unless a specific statutory exception is made. No such exception applied to Ms. Pruce.

4. In 1992, OPERS amended Ohio Admin. Code 145-15-15 and established factors to determine whether a person was a "contract employee," who is eligible for OPERS coverage, or an "independent contractor," who is not eligible for coverage. These factors, which are the same as those promulgated in 1992, are currently listed in Ohio Admin. Code 145-1-42.

12

5. Pursuant to R.C. 145.01, in "all cases of doubt, the [OPERS] Board shall determine whether any person is a public employee, and its decision is final."

6. Ohio Admin. Code 145-1-41(A) states: "In making any determination as to whether an individual is a contract employee or independent contractor under 145.036 of the Revised Code, the public employees retirement board shall review, including but not limited to, the elements described in paragraphs (A)(1) and (A)(2) of the rule 145-1-42 of the Administrative Code."

7. Prior to 2003, the same factors currently set forth in Ohio Admin. Code 145-1-42(A)(1) and (A)(2) were found in Ohio Admin. Code 145-5-15(A)(1) and (A)(2).

8. Reviewing the evidence of the elements set forth in Ohio Admin. Code 145-1-42(A)(2), there is sufficient evidence to establish that during the period April 15, 2002 through January 31, 2009 Ms. Pruce was an independent contractor, and, therefore, not eligible for OPERS membership or service credit for this service.

**Recommendation**

Based upon the evidence, analysis, Findings of Fact and Conclusions of Law, it is recommended that the OPERS Board deny Deborah Pruce's appeal challenging the decision of the OPERS senior staff that she was not a public employee of the public employer, Geauga County Department of Job and Family Services, and not entitled to OPERS membership or service credit while working pursuant to contracts during the time period April 15, 2002 through January 31, 2009. This recommendation is not a final order, and may be approved, modified or rejected by the OPERS Board and shall not become a final order unless and until it is approved by the OPERS Board.

3-31-2015
Date

Mary K. Crawford
Hearing Examiner

13

## CERTIFICATE OF SERVICE

The undersigned certifies that the original of this document was served upon the Ohio Public Employees Retirement System by hand delivery to its offices in Columbus, Ohio on April 2, 2015, to be subsequently served upon the counsel and/or parties to this proceeding by OPERS in the manner provided for by law.

Mary K. Crawford
Hearing Examiner

14